Filed 6/20/24  P. v. Boles CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B315675 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457318) |
| v. | |
| MALCOLM TYRONE BOLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed in part, sentence vacated with directions.

Brad Kaiserman, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

A jury convicted Malcolm Tyrone Boles of human trafficking of a minor for a commercial sex act, several counts of sexual assault, and misdemeanor false imprisonment. Boles was tried with two codefendants. On appeal, Boles contends the trial court violated his right to confrontation by admitting a codefendant's redacted testimonial statement without instructing the jury it could only use the statement against the codefendant or alternatively by not sufficiently redacting the statement. Boles also argues the judgment should be reversed for instructional error regarding two charges: rape in concert and oral copulation in concert. He additionally contends the case should be remanded for resentencing under amended Penal Code section 1170, subdivision (b), and amended section 654.[1]

We conclude the admission of codefendant Kayla Middleton's statements was harmless error given the overwhelming evidence of Boles's guilt. Consistent with our ruling in *People v. Middleton* (2023) 91 Cal.App.5th 749 (*Middleton*), we determine there was no instructional error on the rape-in-concert charge. The People concede, and we agree, that the trial court erred in its instructions on oral copulation in concert, but we conclude the error was harmless beyond a reasonable doubt. We also conclude the case must be remanded for resentencing under amended section 1170, subdivision (b), and amended section 654. Accordingly, we affirm Boles's convictions, vacate the sentence, and remand for resentencing.

---

[1] All undesignated statutory references are to the Penal Code unless otherwise noted.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

In February 2018 the People filed a 19-count information against Boles and codefendants Christopher Sangalang and Middleton, alleging the following charges against Boles:  human trafficking of a minor through use of force, fear, and coercion, in violation of section 236.1, subdivision (c)(2) (count 3); forcible rape of a child over 14 years old in violation of section 261, subdivision (a)(2) (counts 4 and 6); forcible oral copulation in violation of former section 288a, subdivision (c)(2)(A) (now § 287, subd. (c)(2)(A)) (counts 5 and 7);[2] forcible rape and rape by foreign object of a child over 14 years old while acting in concert, in violation of section 264.1, subdivision (b)(2) (count 12); forcible oral copulation of a child over 14 years old while acting in concert, in violation of former section 288a, subdivision (d)(3) (now § 287, subd. (d)(3)) (count 14); kidnapping in violation of section 207, subdivision (a) (count 16); and kidnapping to commit another crime in violation of section 209, subdivision (b)(1) (count 19).  The People additionally alleged the forcible rape and forcible oral copulation counts were committed by way of kidnapping, and Boles administered a controlled substance

---

[2]    Former Penal Code section 288a was amended and renumbered as section 287 by Senate Bill No. 1494 (2017-2018 Reg. Sess.), effective January 1, 2019 (Stats. 2018, ch. 423, § 49).  The text was not substantively changed and the amendments do not affect our analysis.  (See § 287, Stats. 2013, ch. 282, § 1.)

against the victim's will within the meaning of section 667.61, subdivisions (a), (d), and (e).[3]

Boles pleaded not guilty to all charges. Boles, Middleton, and Sangalang were tried together but before separate juries: one jury for Boles and Middleton, and a separate jury for Sangalang.

B.    *Prosecution Evidence*

1.    *Chelsea disappears with Sangalang and Middleton*

The victim was Chelsea B., a 16-year-old girl.[4] At approximately 3:45 p.m. on February 2, 2017 Chelsea's mother dropped Chelsea off at a friend's house to get her hair braided. The mother planned to pick Chelsea up about four to five hours later. Chelsea's mother described Chelsea as a "childlike" girl who required adult supervision and assistance with basic self-care. She found it difficult to read social cues and to recognize unsafe situations.

Chelsea spent the appointment texting with Sangalang, whom she had met on Facebook and considered a potential boyfriend. Chelsea had told Sangalang she was 16. Chelsea had

---

[3]    The kidnapping and administration of controlled substance circumstances were alleged in the information as to Boles as to counts 4, 5, 6, 7, 12, and 14, but only charged to the jury as to counts 6, 7, and 12. Rape in concert was also alleged in the information as an additional circumstance as to Boles as to counts 4, 5, 6, 7, 12, and 14 but not charged to the jury.

[4]    We draw our statement of the evidence from the record, consistent with our previous summary of this trial in *People v. Middleton*, *supra*, 91 Cal.App.5th at pages 757 to 763.

also communicated with Boles on Facebook and told him she was 16.

Sangalang told Chelsea he would pick her up to go to the mall and asked her for money to buy food. Sangalang had previously instructed Chelsea to pack extra clothes before the appointment because they would be going to a hotel together. Sangalang had also told her she could make a lot of money doing sex work and live a "rich, nice life" with lots of cars and a fancy house. Chelsea believed Sangalang was talking about just the two of them.

Before the hair appointment, she had met Sangalang in person twice. He had come to her bedroom window and had asked for money, and she had given him money and her ATM card.

Near the end of the appointment, Sangalang showed up outside Brea Persley's house, where Chelsea was having her hair braided. Sangalang was accompanied by Middleton, whom Chelsea had never met. Persley testified that she told Chelsea it was wrong to invite people over and that she was going to call Chelsea's mother. Sangalang demanded Chelsea give him money and stated angrily, "Come on. Let's go." When Chelsea asked Sangalang who Middleton was, he told her Middleton was his "homegirl." Later Sangalang told Chelsea that Middleton worked for him as his "ho" and "prostitute," but in a police interview Middleton stated she did not have a pimp and worked alone for herself as a prostitute.

Chelsea told Persley she would be back later that night or the next day. Persley testified she went inside to get her phone, and while Persley was inside, Chelsea left with Sangalang and Middleton. Persley called Chelsea's mother and reported what

5

happened, and they both called the police to report Chelsea missing. Chelsea's mother and Persley texted and called Chelsea repeatedly, but she did not respond. Chelsea's mother testified she circled the neighborhood in her car then drove to the Compton sheriff's station when she could not find Chelsea. The police and Chelsea's mother went to Persley's house, and they all searched for Chelsea until 3:00 a.m.

2. *Chelsea is raped by Boles at Middleton's apartment complex and instructed in street prostitution by the three codefendants and another individual*

Chelsea testified that after she left Persley's house, she followed Sangalang and Middleton to a van driven by Sangalang's grandmother. Two little girls and Boles were also in the van. Sangalang yelled at her to get in and told her to sit in the back next to Boles.

Boles began touching Chelsea persistently, wrapping his arm around her waist, pulling her close, squeezing her face, and grabbing her thigh and knee. She repeatedly moved Boles's hands off her and told him "no, don't touch me," and to stop and get away. Boles told her to stop playing "hard to get" and said he had to "fix her attitude." Sangalang moved into the back row on her other side and grabbed her other thigh. Chelsea told Sangalang to stop. Chelsea heard Boles tell Sangalang that Chelsea was going to make them a lot of money.

They arrived at a shopping center, and Sangalang told Middleton to watch Chelsea in the van. Sangalang and Boles got out of the van, along with the grandmother and the little girls. After they left, Chelsea introduced herself to Middleton. She asked why Sangalang told Middleton to watch her; Middleton

6

looked away and changed the subject. Chelsea told Middleton she was 16 years old. When the others returned, Boles continued to rub her thigh and ignored Chelsea's requests to stop.

Sangalang's grandmother dropped Sangalang, Chelsea, Middleton, and Boles near a gas station. Chelsea asked Middleton where they were going, but Middleton did not reply. Chelsea then asked Sangalang where they were going; he told her, "Don't worry about it." The group walked to a smoke shop then to the house of one of Sangalang's friends, where they all smoked marijuana with some other people in a parked van.

Chelsea said she wanted to return to Persley's house. Sangalang replied they were going to Middleton's house first. Before they left for Middleton's house, a young woman named Perfection arrived who Sangalang said was going to fix Chelsea's attitude. Sangalang instructed Chelsea to walk with Perfection and meet them at Middleton's house later. Sangalang, Boles, and Middleton took Chelsea's backpack, purse, and cell phone with them as they left, and told her she would get the items back later.

Middleton had spoken earlier with Chelsea about commercial sex work, instructing her what to charge and not to accept less than she was told. Middleton warned Chelsea if she did not make money Sangalang would get mad. Perfection also told Chelsea that Sangalang expected her to make money for him by having sex with men. Chelsea said she did not want to have sex for money, and Perfection said Sangalang would be angry and would hurt Chelsea if she refused. Perfection described what to charge for different sex acts and took Chelsea to walk an area called "the blade" in search of clients. One man offered them each $100 for sex, but Chelsea told Perfection she did not want to have sex. Perfection then called Sangalang, and he told Chelsea

7

he would beat her unless she made money for him. Around 11:00 p.m., a friend of Perfection's picked them up and dropped Chelsea off at Middleton's apartment complex.

Middleton met Chelsea at the entrance and took her to the complex's laundry room where Boles and Sangalang were waiting. Chelsea's phone was dead. She asked for a charger, but no one gave her one. She asked Middleton, Sangalang and Boles if she could use their phones to contact her mother, but they refused.

Middleton and Chelsea left to go across the street to a gas station to get snacks. Before Middleton and Chelsea left, Sangalang told Middleton to watch Chelsea so "no pimp [would] get [her]," and told Chelsea she could not tell men that she was 16 because it was illegal for men to have sex with people under 18. Men in the store flirted with Chelsea and Middleton, asking their names and ages, and Middleton and Chelsea stated they were 20 years old. Another man asked Chelsea for her name, age, and number. She did not respond, but Middleton told him to give Middleton his number and she would have Chelsea call him.

Middleton and Chelsea returned and rejoined Sangalang and Boles in the laundry room. They all smoked more marijuana, and Sangalang gave Chelsea a pill that made her feel dizzy and unable to walk.

Middleton told Chelsea she had to lose her virginity with Boles or Sangalang. Chelsea told Middleton she was willing to have sex with Sangalang but not Boles. She also told Middleton she did not want to lose her virginity that night, but Middleton told her older guys did not want to have sex with a virgin. Chelsea told Middleton and Sangalang she did not want to have sex with Boles, but Sangalang told her she had to do it.

8

Middleton told the police interviewer she knew Chelsea did not want to have sex with Boles.

Middleton and Sangalang left the laundry room and closed the door, leaving Chelsea alone with Boles. Chelsea told him, "Don't touch me" and pushed him away. Boles rubbed her thighs, ripped her shorts, pushed her to the ground, and got on top of her. Chelsea screamed Middleton's and Sangalang's names loudly for help, but they remained outside. Boles got mad and roughly pulled down her shorts, scratching the side of her thighs and rubbing his penis on her leg. She pushed him off and ran out of the room, slamming the door shut. When Chelsea ran out, she was scared, angry and crying. She told Middleton and Sangalang that she could not have sex and wanted to go home.

Sangalang told Chelsea he would calm Boles down and tell him to go slow. Sangalang went into the laundry room. Middleton told Chelsea everything would be all right and Sangalang would talk with Boles. Sangalang came back and told Chelsea that Boles agreed to be gentle because it was her first time. Chelsea repeated she did not want to have sex with Boles.

Middleton and Sangalang walked Chelsea back into the laundry room and stayed in the room while Boles continued assaulting Chelsea over the following one to two hours. Boles yelled at Chelsea, took off her shirt and bra, and called her offensive names when she continued resisting. Sangalang came over and told Chelsea to relax. Boles took off his clothes and lay on top of Chelsea, pinning down her wrists. Boles shoved his fingers into her vagina. Chelsea repeatedly said he was hurting her and told him to stop, but he did not. When she looked toward Middleton and Sangalang for help, they were having sex with each other. Boles asked Sangalang for a condom, which

9

Sangalang brought him. Boles put his penis in Chelsea's vagina; she was crying in pain and told him repeatedly to stop and that it hurt. She tried to push him off but could not because his body was on top of hers. He got off her and took off the condom and said he was "[going] in raw." She told him not to, but Boles laughed, lay on top of her, pinned her arms about her head, and put his penis in her again, telling her to relax and calling her a crybaby when she cried. Chelsea screamed Sangalang's name and continued to try to push Boles off, telling him he was hurting her and to stop.

Boles demanded oral sex and tried to shove his penis in her mouth. Sangalang told Chelsea to relax her lips and open her mouth when she resisted. Boles put his penis in her mouth and told her to relax. Boles told her she had to call him and Sangalang "Daddy." Chelsea refused, and Boles then choked her and threatened to put a gun to her head and shoot her. In her police interview, Middleton stated that Chelsea made a lot of noise and had repeatedly told Boles to stop, and that Middleton told Boles to leave Chelsea alone but he ignored her.

Chelsea screamed at the top of her lungs during the attack. Middleton told her to stay quiet because people in her apartment building would hear her and call the police. Sangalang and Boles also told Chelsea to stop screaming and shoved a towel in Chelsea's mouth. Boles went back and forth between vaginally and orally copulating her for one or two hours. Boles finally ejaculated on Chelsea's forehead then told her to wipe her face and get dressed. Boles told Middleton to stay with Chelsea, and Boles and Sangalang left the laundry room.

Middleton took Chelsea to her apartment and let her use the bathroom with the door open, saying she could not leave her alone. Chelsea was in too much pain to wipe herself and began crying when she saw she was bleeding. Middleton refused to let Chelsea shower, saying they had to hurry up to leave. Perfection then picked up Chelsea, Middleton, Sangalang, and Boles and left them near a fast food restaurant, where Sangalang gave them all pills that made Chelsea feel high and numb.

They then walked to a burger stand where Middleton instructed Chelsea how to conduct commercial sex work on the street. Middleton ordered food for herself and the two men but not for Chelsea; Sangalang told Chelsea they would feed her after she was done working. Middleton told Chelsea she should be able to make lots of money because many cars had been honking at her which meant they wanted to have sex with her. Middleton told Chelsea what to charge for different sex acts and that she was to give the money she earned to Sangalang and he would give some back to her. Middleton instructed Chelsea on types of men to avoid and told Chelsea not to go home with men but have them order a room close to Sangalang, Middleton, and Boles so they could pick her up. Middleton gave her condoms and told her to make sure she used them. Middleton told her if she did not have sex with men for money, Sangalang would hurt her.

Middleton directed Chelsea to work certain locations along Figueroa Street and Gage Avenue and to call Boles or Sangalang if there was any trouble. Middleton told her to avoid police and not talk to men who did not want to pay for sex. Boles told her to walk slowly and pay attention to the cars. In her police interview, Middleton stated she told Chelsea to have sex with men for money and what to charge; however, Chelsea just walked

11

and did not do anything she was instructed to do.  Sangalang left, and Middleton and Chelsea went to Gage Avenue and walked together for a while with Boles behind them, then took a bus to Figueroa Street.

   3.   *Chelsea is found the day after her disappearance*
   Around 3:00 a.m. on February 3, 2017 Chelsea's mother published a missing person post on Facebook with a photo of Chelsea in the red plaid flannel shirt she was wearing when she went missing.  Around 10:00 a.m., Chelsea's mother received a phone call from a person who reported seeing Chelsea in the same shirt on 66th and Figueroa Streets.  Chelsea's father testified he drove to the area and a woman on the street told him she had seen a young lady in a red flannel shirt with two other people at a nearby convenience store.  As he drove southbound past the store, Chelsea's father saw Chelsea walking with Middleton and Boles, who were unfamiliar to him.  He stopped his car and heard Middleton and Boles both command Chelsea to "[k]eep your fucking head down."  Chelsea's father jumped out and yelled at Chelsea to get in the car while he chased Middleton and Boles, who fled.
   Chelsea was crying.  Her eyes were red, and her voice was shaking.  She looked "like she was on something."  She said, "I'm sorry Daddy.  I don't know what happened; I was scared.  I'm scared."
   Chelsea was taken to the hospital for a sexual assault examination.  Chelsea's underwear was torn, and she reported vaginal pain and pain in her back, hip, and neck.  Chelsea had abrasions to her arms and legs and bruising to her legs.  The opening of her vagina was torn, and her hymen was torn and

12

bruised.  The nurse practitioner was unable to use the speculum as Chelsea was in too much pain.  Chelsea described being sexually assaulted by "Mac" on the laundry room floor, providing details consistent with those summarized above.

Swabs from Chelsea's vulva, anus, and rectum tested positive for blood.  Swabs from her right and left cheeks, mouth, right breast, left breast, chest, neck, vulva, anus, vagina, and back tested positive for semen.  DNA tests of the semen samples matched Boles and excluded Sangalang.  Chelsea reported she consumed marijuana and two pills.  Chelsea's urine sample showed the presence of marijuana, hydrocodone, hydromorphone, amphetamine, and methamphetamine.

C.    *Defense Evidence*

Boles did not testify in his own defense and instead called several witnesses, seeking to impeach details of Chelsea's testimony.  The defense theory of the case was that Chelsea was a runaway who intentionally spent the day partying and doing drugs with the defendants, voluntarily made out with both Boles and Sangalang, voluntarily decided to have sex with Boles after Sangalang rebuffed her, and lied that Boles raped her.  Defense counsel emphasized that there were various inconsistencies in her interview statements and testimony, that Chelsea never tried to run away from the defendants, that she had expressed interest in prostitution, and that she made a number of remarks to Boles and the other defendants that indicated consent to sex.

Forensic interview specialist Susy Flores of the Children's Advocacy Center, who interviewed Chelsea in February 2017, testified that Chelsea told her Middleton and Sangalang could hear but not see her and Boles during the rape.  Chelsea stated

13

that during the rape she was screaming or yelling and that it hurt her. Chelsea further said she told Boles to "stop," and that she was scared of Boles. She stated Boles pinned her down with his hand on her chest, told her to call him "Daddy," and choked her when she refused. Chelsea did not tell Flores that Boles threatened to shoot her or to shove a pill in her mouth, nor that Boles repeatedly called her offensive names, nor that she could not breathe, nor that her eyes rolled back when he choked her. Chelsea told Flores that Boles previously put his hands on her neck in the van and it made her laugh.

Chelsea told Flores when Chelsea and Boles first went into the laundry room, Boles put his hand on her throat and kept telling her to shut up, but she did not listen and "kept yelling at him saying stop it" and to get away and get off of her. Boles held her against the wall and kissed her neck as she kept trying to get away. Boles then pushed her to the ground, pulled his penis out, and told her to suck his penis. Chelsea kept moving her head to get away from Boles. Boles held her head and put his penis on her lips and told her to open her mouth, but she would not. Chelsea did not open her mouth, and kept getting up until he let her leave the laundry room.

Chelsea told Flores that when they returned to the laundry room that she was quiet and looked at Boles, "like, 'Okay, cool, I'm gonna go with it.'" Chelsea then described being raped by Boles on the laundry room floor. After first having intercourse with her when they returned to the laundry room, Boles stopped and said he was going to slap her if she did not open her mouth. Chelsea complied and Boles inserted his penis into her mouth, told her to suck it, and that if she bit him he would slap her with his penis.

14

Of the entire incident, Chelsea stated to Flores, "I really don't know but it was like I don't know if it was sex or I don't know if it was rape because I never been through it." Chelsea stated to Flores there was a towel in her mouth during parts of the attack. Chelsea said she did not call her mother because she did not want her to know she was hanging out with friends, and she did not say she was kept from using her cell phone. Chelsea told Flores about Perfection, but not that she had come to "fix" Chelsea's attitude.

Detective Sam Dang, who spoke with Chelsea at the station after she was found, testified she made no mention of any use or threats of firearms in their conversation about the incident, was unable to sit and stated her privates hurt, and told him she was uncomfortable speaking to him because he was a man.

Detective Cynthia Sanchez, who interviewed Chelsea after Detective Dang, testified Chelsea did not use the word "rape"; Chelsea said she lost her virginity and that it was rough and hard. Chelsea never mentioned being threatened with a gun, being repeatedly called offensive names, asking for a phone charger, any defendant taking her belongings, or any defendant choking her to the point where she could not breathe and her eyes rolled back.

Middleton's father testified that on February 2 or 3, 2017, between midnight and 4:00 a.m., Middleton brought a friend inside their apartment to use the bathroom. At no time that night or any other night did he hear screaming or yelling around the laundry room or in the courtyard.

15

D.    *Jury Verdict, Motion for New Trial, and Sentencing*

The jury convicted Boles of human trafficking of a minor for a commercial sex act by use of force or fear (count 3; § 236.1, subd. (c)(2)), forcible rape of a child over 14 years old (count 6; § 261, subd. (a)(2)); forcible oral copulation (count 7; former § 288a, subd. (c)(2)(A), now § 287, subd. (c)(2)(A)); forcible rape and rape by foreign object of a child over 14 years old while acting in concert (count 12; § 264.1, subd. (b)(2)); forcible oral copulation of a child over 14 years old while acting in concert (count 14; former § 288a, subd. (d)(3), now § 287, subd. (d)(3)); and the lesser included charge of misdemeanor false imprisonment (§ 237, subd. (a)) on count 16.  On counts 6, 7, and 12, the jury found not true the allegations that the offenses were committed by way of kidnapping and that Boles administered a controlled substance against the victim's will under section 667.61, subdivisions (a), (d), and (e).  The jury acquitted Boles on counts 4, 5, and 19.

On Boles's motion for a new trial, the court ruled there was no significant evidence of force or fear on the human trafficking count and granted the motion for a new trial as to that allegation only, and further ruled the allegation could not be tried in front of a jury again and that the court's ruling was "more akin to finding the lesser included offense."  The court denied the motion as to the rest of the charges.

The court sentenced Boles to an aggregate prison term of 21 years and eight months, consisting of the middle term of 10 years for oral copulation in concert (count 14), as the base term; a consecutive term of two years and eight months (one third the middle term) for human trafficking of a minor (count 3); a consecutive term of the middle term of nine years for forcible

16

rape (count 6); and a concurrent term of one year for false imprisonment (count 16).

The court also imposed the middle term of six years for forcible oral copulation (count 7) and the middle term of nine years for forcible rape and rape by foreign object (count 12), but those sentences were stayed pursuant to section 654. The court imposed fines and fees and credited Boles with 1,594 days actual credit plus 239 days good time/work time for a total of 1,833 days.

This timely appeal followed.

## DISCUSSION

Boles argues the trial court violated his federal and state constitutional right to confrontation by admitting into evidence a statement from Middleton, further described below, without a limiting instruction. He also contends the trial court gave incorrect jury instructions regarding the rape in concert and oral copulation in concert charges. Boles further argues he is entitled to resentencing under amendments to sections 1170, subdivision (b), and 654.

A.  *The Constitutional Right to Confrontation*
1.  *Governing law and standard of review*
The confrontation clause of the Sixth Amendment, applicable to the states through the 14th Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court held that the Sixth Amendment bars the introduction of a

17

witness's out-of-court "testimonial hearsay" statements at trial unless the witness is unavailable and the defendant has had an opportunity to cross-examine the witness. (*Id.* at pp. 68-69.) "Testimonial" out-of-court statements expressly include those elicited in the context of police interrogations. (*Id.* at p. 53, fn. 4 [noting a witness's "recorded statement, knowingly given in responses to structured police questioning, qualifies under any conceivable definition" of interrogation]; accord, *People v. Cage* (2007) 40 Cal.4th 965, 978.)

If a statement is determined to be testimonial, we apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to confrontation. (See *People v. Sweeney* (2009) 175 Cal.App.4th 210, 221; see also *People v. Bunyard* (2009) 45 Cal.4th 836, 850.) "'"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [*Chapman*].' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error."'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 395; see *People v. Perez* (2018) 4 Cal.5th 421, 438 ["[W]e evaluate federal constitutional error for harmlessness under the *Chapman* beyond a reasonable doubt standard, and state law error under the [*People v.*] *Watson* [(1956) 46 Cal.2d 818] reasonably probable standard."].)

Under the *Aranda/Bruton* rule, where two defendants are jointly tried before the same jury, a nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible as a violation of the latter's rights to confrontation and cross-examination. (See *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123; see also

18

*People v. Capistrano* (2014) 59 Cal.4th 830, 868-869 [""*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.""""]

However, in *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), the United States Supreme Court limited the scope of the *Bruton* rule, holding that in a joint trial where a codefendant's confession does not incriminate the defendant on its face, only by implication, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id.* at p. 211.) "'The [*Richardson*] court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. [Citation.] That is because, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence."'" (*People v. Flinner* (2020) 10 Cal.5th 686, 744.)

2. *Middleton's statement*

Detective Sammy Cruz interviewed Middleton on August 21, 2017, and the prosecution sought to introduce the recording and a transcript of Middleton's statement into

evidence. Middleton's statement was redacted both to omit reference to Boles by name and to omit reference to the existence of an involved man or boy other than Sangalang in the laundry room, van, and other locations. Boles initially objected to the admission of the entirety of the interview because "all that was done essentially was to remove [Boles's] name. It's still incrimination. Everyone is going to know it's him, so it's the equivalent of saying, 'You know who did this and that.'" Ultimately, the trial court and defense counsel reviewed the interview to determine if any statements violated Boles's constitutional right to confront the witnesses against him under *Bruton*/*Aranda,* additional redactions were made, and the redacted interview was admitted.[5]

After the interview had been redacted, Middleton's attorney argued it was "improper opinion" and "irrelevant" to leave in Middleton's statement that if she had been in the girl's place in the laundry room, she "would feel like I'm being

---

[5] Although the People argue Boles waived his claim of *Aranda/Bruton* error by withdrawing his objection to the admission of Middleton's interview after redactions were made, the People also concede it was error to admit the interview without a limiting instruction stating that it could only be used as evidence against Middleton. Failure to timely and specifically object on confrontation clause grounds generally forfeits this argument. (See *People v. Redd* (2010) 48 Cal.4th 691, 730.) Under the circumstances, however, because the conceded error arguably affected the defendant's substantial rights, we exercise our discretion to determine whether the error was harmless beyond a reasonable doubt. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)

violated."  Boles's attorney also objected to the introduction of this statement under Evidence Code section 352.  The trial court overruled the objections.

The redacted interview was played for the jury with no limiting instruction in court or in the jury instructions that the statements could only be used against Middleton.

As presented to the jury, in her statement Middleton acknowledged having sex with Sangalang on one prior occasion in the laundry room and stated that a week after that they hung out with another girl present but could not remember her name. Middleton described Sangalang's grandmother driving her and Sangalang in a van with some "little kids" to a house where Sangalang got out and got the girl, then they got food and then the grandmother dropped "me, Chris, and the girl" at a smoke shop.

After that they went to Middleton's apartment building where they "went inside of the laundry mat [*sic*]" for "quite a few hours," "at least like . . . 3, 4 hours."  She stated Sangalang "had sex with the other girl."  The girl told Middleton "she basically ran away from home."  Middleton recalled seeing the girl leave the laundry room, and when the girl returned, she seemed irritated.  Middleton saw her crying.  The girl exited the laundry room a second time, and Middleton told the girl she did not want the girl going in and out because it might cause the security guard to say that they could not be in there.  Middleton stated the girl was "unhappy" with being unable to leave the room.

Middleton stated that when she was in the laundry room, she was a "cool distance" away and around a corner such that she could not see anyone else.  She said that if she had been in the girl's place in the laundry room, she "would feel like I'm being

21

violated." Middleton confirmed the girl had sex, and stated that although they were in the laundry room three to four hours, "the having sex thing, that was only like an hour." The girl made a lot of noise in the laundry room, and Sangalang handed the girl something to put in her mouth so she would not make as much noise.

In the morning, the girl washed her face at Middleton's apartment, then they went to Western and Figueroa, where they were "trying to put her down." Middleton explained to the girl that she had "sex and stuff . . . with Johns . . . for money," and how to walk and look in the cars. Middleton told the girl she herself charged $100, and Sangalang told the girl to charge at least $80 or $100. Middleton told Detective Cruz that the girl was "gonna get beat up" if "she didn't catch a date." Eventually they took the bus to Figueroa and Manchester and walked down "to like 80th or 81st." There, an older guy in his late 30s or early 40s pulled up in a car and started screaming at them and told the girl to get in the car, Middleton ran away across the street, and the girl got in the car and left with the man.

3.  *The trial court erred by admitting Middleton's statement without a limiting instruction, but the error was harmless beyond a reasonable doubt*

The parties do not dispute that Middleton's statements to the police were testimonial. Boles contends admission of Middleton's testimonial statement violated his federal and state constitutional right to confront the witnesses against him. Boles alternatively argues Middleton's interview should have been further redacted to remove Middleton's statement that if she had been in the girl's place in the laundry room, she "would feel like

22

I'm being violated." Boles argues that although he is not expressly named, the factual context strongly suggests Middleton is talking about Boles.

The People concede the trial court erred by admitting Middleton's redacted interview without a limiting instruction stating it could only be used as evidence against Middleton. However, they argue the error was harmless beyond a reasonable doubt because Middleton's statement did not mention Boles or Boles's existence, and Chelsea gave "detailed and damning testimony" about Boles at trial.

We conclude that ample independent evidence supported Boles's convictions of forcible rape, rape in concert, forcible oral copulation, oral copulation in concert, human trafficking for a commercial sex act, and false imprisonment. In this light, the admission of Middleton's statement without a limiting instruction was harmless beyond a reasonable doubt. Nothing in Middleton's statement directly implicated Boles, whose involvement in the sexual assault and attempted commercial sex trafficking of Chelsea were proven by independent evidence. This evidence included Chelsea's detailed testimony, her consistent statements to law enforcement, medical providers and social workers, and medical examination and DNA analysis.

In addition to Chelsea's testimony and statements, "there was incontrovertible evidence that sexual intercourse occurred." (*People v. Vargas* (2009) 178 Cal.App.4th 647, 663 [erroneous admission of nontestifying victim's testimonial statement that sexual intercourse occurred harmless].) As in *Vargas*, "the vaginal swabs taken from [Chelsea] contained spermatozoa with [Boles's] DNA profile. Moreover, [the nurse practitioner] observed injuries to [Chelsea's] genitalia consistent with blunt

23

force trauma," including that the opening of her vagina was torn, her hymen was torn and bruised, and she was in too much pain for the nurse practitioner to insert a speculum. (*Ibid.*) Swabs from Chelsea's mouth and face also tested positive for semen, and DNA tests of the semen samples matched Boles and excluded Sangalang.

There was thus ample evidence, independent of Middleton's statement, to support Boles's convictions. (See *People v. Flinner, supra,* 10 Cal.5th at p. 747 [erroneous admission of separately-tried codefendant's testimonial statement harmless beyond reasonable doubt where there was "ample evidence" of guilt, statement was cumulative of other evidence, and the admitted portions did not directly implicate defendant].) Any implication from Middleton's statement that Boles violated Chelsea is at most cumulative of other evidence.

It is clear beyond a reasonable doubt that a rational jury would have convicted Boles even in the absence of Middleton's redacted statement. For that reason, and because the redacted version of Middleton's statement admitted at trial did not directly inculpate Boles, its admission was harmless beyond a reasonable doubt.

Because we conclude that any error here was harmless under *Chapman*, we need not separately consider Boles's arguments of state law error, which would be reviewed under the less demanding standard of *People v. Watson, supra,* 46 Cal.2d 818. (See *People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 395.)

B.      *Boles's Claims of Instructional Error*

      1.      *Standard of review*

"""[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo.""" (*Middleton, supra,* 91 Cal.App.5th at p. 764; accord, *People v. Dearborne* (2019) 34 Cal.App.5th 250, 260 (*Dearborne*).) """It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence'" and "'necessary for the jury's understanding of the case.""" (*People v. Molano* (2019) 7 Cal.5th 620, 667.)

      2.      *The trial court did not err in its rape-in-concert instructions*

As to Boles's argument of instructional error on the rape-in-concert charge in count 12, we previously rejected this same argument from his codefendant Middleton.  Boles does not address our published decision, nor does he provide any persuasive reason to depart from our prior analysis.  Accordingly, we rely on our analysis from *Middleton*.

Under section 264.1, subdivision (a), a defendant commits the crime of rape in concert "when the defendant, voluntarily acting in concert with another person, *by force or violence* and against the will of the victim, committed an act described in Section 261 . . . , either personally or by aiding and abetting the other person."  (Italics added.)

Section 261, subdivision (a)(2), provides in part:  "(a) Rape is an act of sexual intercourse accomplished under any of the following circumstances:  [¶] . . . [¶]  (2) If it is accomplished against a person's will by means of *force, violence, duress,*

25

*menace, or fear* of immediate and unlawful bodily injury on the person or another."  (Italics added.)

The court instructed the jury on rape in concert using CALCRIM No. 1001, which provided in relevant part:  "Boles is charged in Count Twelve . . . with committing rape by acting in concert in violation of Penal Code section 264.1.  [¶]  To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant personally committed forcible rape and voluntarily acted with someone else who aided and abetted its commission; [¶] OR [¶]  2.  The defendant voluntarily aided and abetted someone else who personally committed forcible rape.  [¶]  To decide whether a defendant committed rape, please refer to the separate instruction that I have given you on that crime. . . .  You must apply those instructions when you decide whether the People have proved rape in concert."

The separate instruction regarding rape was based on CALCRIM No. 1000.  It stated in relevant part:

"Defendant Malcolm Boles is charged in Counts Two and Four with rape by force in violation of Penal Code section 261(a).  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant had sexual intercourse with a female;  [¶]  2.  He and the female were not married to each other at the time of the intercourse;  [¶]  3.  The female did not consent to the intercourse; AND [¶]  4.  The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the female or to someone else.  [¶] . . . .

"Intercourse is *accomplished by force* if a person uses enough physical force to overcome the female's will.

26

"Duress means a direct or implied threat of force, violence, danger or retribution that would cause a reasonable person to do something that she would not do otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the female's age and her relationship to the defendant.

"*Retribution* is a form of payback or revenge.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"Intercourse is *accomplished by fear* if the female is actually and reasonably afraid."

Boles did not object to these instructions and did not ask for a clarifying instruction.

Boles argues that to convict him of rape in concert, the jury had to find he, as the personal perpetrator, raped Chelsea "'by force or violence'"; rape by means of duress, menace or fear is not enough. Boles further argues that by directing the jury to CALCRIM No. 1000 to decide whether a defendant committed rape, the jury was improperly instructed that rape in concert could be based on a rape committed by means of duress, menace or fear. He contends this improperly lowered the burden of proof.

As noted, the jury was instructed that to convict Boles of rape in concert, it had to find he "personally committed forcible rape." The jury would understand from this that it had to find rape by force. In *Dearborne, supra,* 34 Cal.App.5th at page 262, the court was faced with the same instructions used here and concluded there was no instructional error: "[T]he word 'force' does not have a technical legal meaning in this context, and is instead used in its ordinary sense. Accordingly, the court was only required to tell the jury that the rape had to be by force. It

27

did so by telling the jury the rape had to be 'forcible.'" (*Ibid*.) We reach the same conclusion here: There was no instructional error.

Further, as *Dearborne* and *Middleton* concluded, to the extent the use of CALCRIM No. 1000 rendered the rape-in-concert instruction "unclear or confusing," Boles forfeited the argument by failing to object at trial. (See *Dearborne, supra,* 34 Cal.App.5th at p. 262 ["'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.'"]; accord, *Middleton, supra,* 91 Cal.App.5th at p. 772.)

In any event, any instructional error would have been harmless beyond a reasonable doubt. Boles argues the jury was erroneously instructed it could convict him of rape in concert if it found he personally committed a rape by duress, menace, or fear as an alternative to finding he personally committed a rape by force or violence. Even assuming the jury was so instructed and even assuming such an instruction was erroneous, it is clear beyond a reasonable doubt the jury would still have found Boles guilty of rape in concert if it had been given only the "correct" instruction, which (according to Boles) would have limited the definition of rape by force to only rape by force or violence. (See *Middleton, supra,* 91 Cal.App.5th at p. 775.)

The evidence is overwhelming that the rape here was a rape by force; Boles does not meaningfully contest that point. In convicting Boles of rape in concert, the jury necessarily found that he, as the personal perpetrator of the rape, committed a rape by force. There is no evidence the rape was committed by any

28

means other than force. (See *In re Lopez, supra,* 14 Cal.5th at p. 568 [In determining whether an alternate theory error is harmless under *Chapman, supra,* 386 U.S. 18, "a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability."]; accord, *Middleton, supra,* 91 Cal.App.5th at p. 775.)

> 3. *The trial court erred in its instructions on oral copulation in concert, but the error was harmless beyond a reasonable doubt*

Boles was convicted of "oral copulation by acting in concert with force" upon a child victim 14 or older in violation of former section 288a, subdivision (d)(3) (now § 287, subdivision (d)(3)). Boles contends, and the People concede, that the court's instructions erroneously allowed the jury to convict Boles on this count without making the necessary finding that the oral copulation was accomplished using force or fear.

The relevant statutory provision states in relevant part: "Any person who, while voluntarily acting in concert with another person, either personally or aiding and abetting that other person, commits an act of oral copulation upon a victim who is a minor 14 years of age or older, *when the act is accomplished against the victim's will by means of force or fear* of immediate and unlawful bodily injury on the victim or another person, shall be punished by imprisonment in the state prison for 8, 10, or 12 years." (§ 287, subd. (d)(3), italics added.)

29

The court instructed the jury on this count using CALCRIM No. 1016, which provided in relevant part: "Boles is charged in Count Fourteen with committing oral copulation by acting in concert in violation of Penal Code section 288a(d). [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant personally committed oral copulation and voluntarily acted with someone else who aided and abetted its commission; [¶] OR [¶] 2. The defendant voluntarily aided and abetted someone else who personally committed oral copulation. [¶] To decide whether a defendant committed oral copulation, please refer to the separate instruction that I have given you on that crime. . . . You must apply those instructions when you decide whether the People have proved oral copulation in concert."

The separate instruction regarding oral copulation was based on CALCRIM No. 1015. Although this instruction described in full the crime of forcible oral copulation, it also internally defined "oral copulation" without reference to force, fear, or lack of consent. It stated in part: "Boles is charged in Counts Five and Seven with oral copulation by force in violation of Penal Code section 288a. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of oral copulation with someone else; [¶] 2. The other person did not consent to the act; [¶] AND [¶] 3. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone. [¶] *Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or

30

anus of another person.  Penetration is not required."[6]  (Italics in original.)

Because the CALCRIM No. 1016 oral copulation in concert instruction itself contained no requirement that the oral copulation be accomplished by force or fear (unlike the rape-in-concert instruction, which stated the rape must be "forcible"), a jury could conclude that Boles was guilty of oral copulation in concert based on personally committing oral copulation as defined in CALCRIM No. 1015—i.e. "any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person."

This error, however, was harmless beyond a reasonable doubt.  The evidence was overwhelming that the oral copulation here was accomplished by force, a point Boles does not meaningfully contest.[7]  The oral copulation was committed by

---

[6]     The CALCRIM No. 1015 instruction further specified:  "An act is *accomplished by force* if a person uses enough physical force to overcome the other person's will.  [¶]  *Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do something that he or she would not otherwise do.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.  [¶]  *Retribution* is a form of payback or revenge.  [¶]  *Menace* means a threat, statement, or act showing an intent to injure someone.  [¶]  An act is accomplished by fear if the other person is actually and reasonably afraid."  (Italics in original.)

[7]     This evidence includes that Chelsea resisted when Boles first tried to shove his penis in her mouth; Boles pushed her to the ground, pulled his penis out, and told her to suck his penis;

31

force and against Chelsea's will.  Thus, it is clear beyond a reasonable doubt the jury would still have found Boles guilty of forcible oral copulation in concert if it had been given only the "correct" instruction, which (according to Boles) would have defined oral copulation for purposes of forcible oral copulation in concert as oral copulation against the victim's will by means of force or fear of immediate and unlawful bodily injury.

In separately convicting Boles of forcible oral copulation (count 7), the jury also necessarily found that he, as the personal perpetrator of the oral copulation, did so by force, violence, duress, menace, or fear of immediate and unlawful bodily injury without Chelsea's consent.  (§ 287, subd. (c)(2)(A); formerly § 288a, subd. (c)(2)(A).)  Boles argues his conviction under count 7 cannot be used to support the requisite finding of oral copulation accomplished by force or fear for purposes of oral copulation in concert because the count 7 conviction could have been based on "duress" or "menace" (terms which appear in the forcible oral copulation instruction and statute but not in the oral copulation in concert statute).  Assuming, without deciding, this was error, we conclude any such error would have been harmless in light of the overwhelming evidence the oral copulation was accomplished

---

Chelsea kept moving her head to get away but Boles held her head and put his penis on her lips; after first raping her, Boles said he was going to slap her if she did not open her mouth; Boles inserted his penis into her mouth, told her to suck it, and that if she bit him, he would slap her with his penis and Boles alternated between intercourse and orally copulating her for one to two hours while she told him to stop and screamed loudly until Sangalang placed a towel in her mouth.

by force, satisfying the necessary predicate finding for the oral copulation in concert conviction.

C.      *There Was No Prejudice from the Cumulative Effect of the Errors*

Boles contends he suffered cumulative prejudice from multiple errors.  "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*In re Reno* (2012) 55 Cal.4th 428, 483 ["In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself."].)  In evaluating cumulative prejudice, we consider whether the aggregate errors caused the trial to be fundamentally unfair in violation of the Fourteenth Amendment's due process guarantee.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 890; *People v. Camacho* (2022) 14 Cal.5th 77, 132 [cumulative error did not render trial constitutionally unfair, observing "'[d]efendant was entitled to a fair trial but not a perfect one'"]; *People v. Thomas* (2021) 64 Cal.App.5th 924, 971 ["'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'"].)

Considered cumulatively, the errors we identify did not affect the outcome of Boles's trial or deprive him of a fair trial.  As discussed, the admission of Middleton's testimonial statement and the jury instruction on oral copulation in concert were harmless beyond a reasonable doubt.  Given the overwhelming evidence of Boles's guilt, these errors considered together did not cause the trial to be fundamentally unfair.

D.   *Because the Trial Court's Sentence Did Not Comply with Amended Section 1170, Subdivision (b), Remand is Necessary*

Boles contends his case should be remanded for resentencing because the trial court imposed middle term sentences on multiple counts without complying with the provisions of amended section 1170, subdivision (b).  Specifically, the provision that the lower term is the presumptive term for a defendant under the age of 26 at the time of the offense whose youth "contributed to the commission of the offense," unless the court finds that the aggravating circumstances outweigh the mitigating circumstances such that imposition of the lower term would be "contrary to the interests of justice."  (§ 1170, subd. (b)(6)(B)).  Boles's contention has merit.

1.   *Section 1170, subdivision (b)*

At the time Boles was alleged to have committed the crimes (February 2017), he was 19 years old.  When the trial court sentenced Boles in September 2021, former section 1170, subdivison (b), provided, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (Stats. 2020, ch. 29, § 14.)

Effective January 1, 2022, Senate Bill No. 567 (2020-2021 Reg. Sess.) "amended section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist."  (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*); see Stats. 2021, ch. 731, § 1.3.)  Amended section 1170, subdivisions (b)(1) and (b)(2), now provides:  "(1)  When a judgment of imprisonment is to

34

be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).  [¶]  (2)  The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Flores,* at p. 1038; Stats. 2021, ch. 731, § 1; see *People v. Dunn* (2022) 81 Cal.App.5th 394, 401-403, review granted Oct. 12, 2022, S275655 (*Dunn*); see also *People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*).)  "There is an exception to this rule for prior convictions." (*People v. Ruiz* (2023) 97 Cal.App.5th 1068, 1074, review granted Mar. 12, 2024, S283504.)  "Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction," without it having been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial.  (§ 1170, subd. (b)(3); *People v. Suazo* (2023) 95 Cal.App.5th 681, 705 (*Suazo*); see Cal. Rules of Court, rule 4.420(c).)

Further, Senate Bill No. 567 and Assembly Bill No. 124 (2020-2021 Reg. Sess.) "added subdivision (b)(6) to section 1170, which now provides [in relevant part] that 'unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a

contributing factor in the commission of the offense: . . . (B)  The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.'" (*Suazo, supra,* 95 Cal.App.5th at p. 705; see *People v. Gaines* (2023) 93 Cal.App.5th 91, 142 [Sen. Bill No. 567 incorporates amendments proposed by Assem. Bill No. 124 as the operative law].)  A defendant is considered a "youth" for purposes of this provision if the defendant was "under 26 years of age on the date the offense was committed."  (§§ 1016.7, subd. (b); 1170, subd. (b)(6)(B); *Flores, supra,* 73 Cal.App.5th at p. 1039.)  "Thus, the legislation 'establishes a presumption of the lower term if the defendant's youth was "a contributing factor" in [the] commission of the crime.'"  (*People v. Fox* (2023) 90 Cal.App.5th 826, 831, fn. 5; accord, *Flores, supra,* 73 Cal.App.5th at p. 1039.)  But "the court remains authorized to impose the middle term if the court determines that the aggravating and mitigating factors show that imposition of the lower term would be contrary to the interest of justice."  (*People v. Hilburn* (2023) 93 Cal.App.5th 189, 203).[8]

At least two courts addressing section 1170, subdivision (b)(6), have held that—unlike aggravating circumstances necessary to impose the upper term under subdivision (b)(2)—aggravating circumstances considered when evaluating whether to impose the middle term for a youth need not be admitted by the defendant or found by a jury beyond a

---

[8]     Effective March 2022, California Rules of Court, rule 4.420, which sets forth the criteria for selecting the appropriate term of imprisonment in felony sentencing, was also revised to incorporate these amendments.  (See *Hilburn, supra,* 93 Cal.App.5th at p. 201; see also Cal. Rules of Court, rule 4.420.)

reasonable doubt.  (See *Hilburn, supra,* 93 Cal.App.5th at pp. 204-205 [imposition of middle term under § 1170, subd. (b)(6), does not require aggravating factors to be proven beyond a reasonable doubt under *Apprendi v. New Jersey* (2000) 530 U.S. 466]; *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 928-929 (*Bautista-Castanon*) [declining to import the requirements of § 1170, subd. (b)(2), into subd. (b)(6), as a prerequisite to imposing the middle term]; see also Cal. Rules of Court, rule 4.420(d).)

Boles contends, the People concede, and we agree the amendments to section 1170 are ameliorative changes that apply retroactively to Boles's nonfinal judgment.  (See *Dunn, supra,* 81 Cal.App.5th at p. 403; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*); *Lopez, supra,* 78 Cal.App.5th at p. 465; *Flores, supra,* 73 Cal.App.5th at p. 1039.)

2.     *The trial court imposed middle terms for multiple counts without deciding whether Boles's youth was a contributing factor to the crimes or that imposition of the lower term would be contrary to the interests of justice*

The court sentenced Boles to an aggregate prison term of 21 years and eight months, consisting of the middle term of 10 years for oral copulation in concert (count 14), as the base term; a consecutive term of two years and eight months (one third the middle term) for human trafficking of a minor (count 3); a consecutive term of the middle term of nine years for forcible rape (count 6); and a concurrent term of one year for false imprisonment (count 16).  The court also imposed the middle term of six years for forcible oral copulation (count 7) and the

37

middle term of nine years for forcible rape and rape by foreign object (count 12), but those sentences were stayed pursuant to section 654.

Regarding the base term for oral copulation in concert (count 14), the court explained it was imposing the middle term because there were factors both in aggravation and mitigation. The court found factors in aggravation included Boles's prior criminal history and that he was on probation at the time of the offense. The court stated factors in mitigation included that certain evidence indicated Boles may have been induced by Sangalang to commit the crime; the court noted there were additional factors in mitigation argued by Boles's counsel and in the mitigation report, but did not make other particularized findings regarding circumstances in mitigation or in aggravation.[9]

At the time Boles was sentenced, section 1170 had not yet been amended, and the trial court did not make the requisite findings to sentence him to the middle term. Defense counsel argued in Boles's sentencing memorandum and at the sentencing hearing that his youth was a mitigating factor, but the court did not expressly determine whether his youth was a "contributing factor in the commission of the offense" before examining the aggravating and mitigating circumstances. The trial court also

---

[9] The People argue that, "As to counts 3 and 6, the court imposed the mid-term because the victim in this matter was particularly vulnerable." But as to these counts, the court did not contemplate that the victim's vulnerability warranted the middle term, and instead stated it used this factor in its determination that the sentences for these counts were to run consecutively. (See Cal. Rules of Court, rule 4.425.)

38

did not make a finding "'that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice'" (*Hilburn, supra,* 93 Cal.App.5th at p. 200), as required under the amended statutory provision. After the statutory amendments went into effect, "under section 1170, subdivision (b)(6), the sentencing court is tasked with assessing mitigating and aggravating factors to impose the middle term *only* if it first determines that the defendant qualifies for treatment under the provision—because he or she . . . is a youthful offender, . . . *and* those circumstances contributed to the offense." (*Id.* at p. 205, emphasis added.)

"Remand for resentencing is required in this case 'unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion."'" (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096 (*Gerson*), quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) This is because defendants are entitled to sentencing decisions made in the exercise of the "'informed discretion'" of the sentencing court. (*Gerson*, at p. 1096.) A court that is not aware of the scope of its discretionary powers does not exercise that informed discretion. (See *ibid.*)

We conclude the record before us does not "clearly indicate" the trial court would have imposed the same sentence had it exercised its new discretion under amended section 1170. As noted, because at the time Boles was sentenced section 1170 had not yet been amended, the trial court made no finding regarding whether Boles's youth was a contributing factor to the commission of the crime. And the trial court's weighing of the mitigating and aggravating circumstances is insufficiently

39

detailed for us to conclude that it would have determined that imposing the lower term would be "contrary to the interests of justice." Here, the only aggravating factors expressly mentioned by the trial court in selecting the middle terms were Boles's prior criminal history and probation status at the time of the offense, and the only specific factor in mitigation mentioned by the court was that Boles may have been induced by Sangalang to commit the crime.[10] The trial court acknowledged the existence of, but did not specifically weigh, any other factors raised by the parties, leaving us to speculate about the impact other factors or combinations of factors may have had on its decision-making. (Cf. *Lopez, supra,* 78 Cal.App.5th at p. 468 [remand required where trial court relied on "long list" of aggravating factors but gave no indication what decision it would make if fewer factors were available].) Overall, we cannot say with certainty how the court assessed other aggravating and mitigating factors, much less whether it would conclude a middle term was warranted "in the interests of justice" under amended section 1170. At most, the record indicates the court weighed aggravating and mitigating factors against each other and implicitly found they balanced out, supporting a middle term sentence under the former section 1170. The trial court should have the opportunity, in the first instance, to consider whether a lower term sentence

---

[10] Boles argues the trial court's reliance on his criminal history did not comply with section 1170, subdivision (b)(3). As noted, that subdivision allows courts to consider the defendant's prior convictions as an aggravating factor when imposing an upper term based on a certified record of conviction. Boles cites no authority that applies to section 1170, subdivision (b)(3), where, as here, the upper term is not implicated.

40

should be imposed, and the record does not clearly indicate how the trial court would choose to exercise that discretion.

Accordingly, we vacate the sentence and remand for the trial court to resentence Boles under amended section 1170, subdivision (b). (See *Flores, supra,* 73 Cal.App.5th at p. 1039 [vacating middle term sentence and remanding to the trial court to decide in the first instance whether defendant under the age of 26 is entitled to the lower term under the amended law]; *Bautista-Castanon, supra,* 89 Cal.App.5th at p. 928 [vacating upper term sentence for 19-year-old defendant and remanding for resentencing under amended § 1170, subds. (b)(1)-(3) and (b)(6)].) On remand, "full resentencing" is warranted, including applicable retroactive changes in the law. (*People v. Jones* (2022) 79 Cal.App.5th 37, 46 ["the need to apply amended sections 1170, subdivision (b), and 654 creates sufficiently "'changed circumstances'" [citation] to warrant a full resentencing"]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902 ["the trial court may revisit all of its sentencing choices in light of" the amendments to § 1170, subd. (b)].) "A full resentencing may involve the trial court's revisiting such decisions as the selection of a principal term, whether to stay a sentence, whether to impose an upper, middle, or lower term, and whether to impose concurrent or consecutive sentences." (*Jones*, at p. 46; *Bautista-Castanon,* at p. 927.)

"On remand, the parties are free to argue for the term they believe is appropriate under the applicable law." (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 132; see *Bautista-Castanon, supra,* 89 Cal.App.5th at p. 931 ["at resentencing, [defendant] may urge the court to consider any factors in mitigation that he believes are appropriate"].) We decline to "direct the trial court

as to the factors it should consider or the weight it should assign to any factor." (*Bautista-Castanon,* at p. 931.)

E.    *The Trial Court's Sentence Did Not Comply with Amended Section 654, Which Must Also be Applied on Remand*

At the time of Boles's sentencing in 2021, former section 654, subdivision (a), provided, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." As discussed, pursuant to former section 654, the trial court sentenced Boles to 10 years for oral copulation in concert (count 14), a consecutive term of two years and eight months for human trafficking of a minor (count 3), a consecutive term of nine years for forcible rape (count 6), and a concurrent term of one year for false imprisonment (count 16). It imposed and stayed terms of six years for forcible oral copulation (count 7) and nine years for forcible rape and rape by foreign object (count 12), pursuant to former section 654.

Effective January 1, 2022, Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441) amended section 654 "to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct." (*Lopez, supra,* 78 Cal.App.5th at p. 468; accord, *People v. Mani* (2022) 74 Cal.App.5th 343, 379 ["section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence"].)

42

Boles contends, the People concede, and we agree Assembly Bill No. 518's changes to section 654 are ameliorative changes that apply retroactively to nonfinal judgments under *In re Estrada* (1965) 63 Cal.2d 740, 744-745. (See *People v. Fugit* (2023) 88 Cal.App.5th 981, 995-996 [defendant entitled to retroactive benefit of Assembly Bill No. 518]; *People v. Mani, supra,* 74 Cal.App.5th at pp. 379-380 [same]; see also *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

Boles argues it was error for the trial court to impose and execute the longer term sentence for oral copulation in concert and stay the shorter term for forcible oral copulation, when each punished him for the same act. Boles's argument has merit. Because at the time of sentencing, the trial court was required to impose and execute the longest term of imprisonment, but now has discretion as to which term of imprisonment to impose and execute and which to stay, on remand the trial court must be allowed to exercise its new discretion.

The People argue that the error was harmless but we reject the argument because, as outlined above, Boles is entitled to a full resentencing. (See *People v. Jones, supra,* 79 Cal.App.5th at p. 46 ["the need to apply amended sections 1170, subdivision (b), and 654 creates sufficiently "'changed circumstances'" [citation] to warrant a full resentencing"]; *People v. Garcia, supra,* 76 Cal.App.5th at p. 902 ["the trial court may revisit all of its sentencing choices in light of" the amendments to § 1170, subd. (b)].)

# DISPOSITION

The convictions are affirmed.  We vacate the sentence and direct the trial court to resentence Boles in accordance with amended sections 654 and 1170, subdivision (b), and any other applicable ameliorative legislation.

MARTINEZ, P. J.

We concur:

SEGAL, J.

RAPHAEL, J.[*]

---

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44